In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 25-12370

_____

FLORIDA DECIDES HEALTHCARE INC,
MITCHELL EMERSON,
JORDAN SIMMONS,

*Plaintiffs-Appellees*
*Cross Appellants,*

SMART & SAFE FLORIDA,
  Registered Florida Political Committee,
PODER LATINX,
YIVIAN LOPEZ GARCIA,
HUMBERTO ORJUELA PRIETO,

*Intervenor Plaintiffs-Appellees,*

LEAGUE OF WOMEN VOTERS OF FLORIDA,
LEAGUE OF WOMEN VOTERS OF FLORIDA
EDUCATION FUND INC,
LEAGUE OF UNITED LATIN AMERICAN CITIZENS,
CECILE SCOON
DEBRA CHANDLER, et al.,

*Intervenor Plaintiffs-Appellees*
*Cross Appellants,*

2                    Order of the Court                 25-12370

*versus*

FLORIDA SECRETARY OF STATE,
ATTORNEY GENERAL, STATE OF FLORIDA,

*Defendants-Appellants*
*Cross Appellees,*

SUPERVISOR OF ELECTIONS FOR ALACHUA COUNTY, et al.,

*Defendants,*

REPUBLICAN PARTY OF FLORIDA,

*Intervenor Defendant-Appellant*
*Cross Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:25-cv-00211-MW-MAF

_____

Before BRANCH, LAGOA, and ABUDU, Circuit Judges.

LAGOA, Circuit Judge:

On July 8, 2025, the district court issued a preliminary injunction barring certain Florida officials from enforcing provisions of Florida law that prohibit and penalize the collection, delivery, and physical possession of "signatures or initiative petitions" by non-Florida residents and non-U.S. citizens. *See* Fla. Stat. §§ 100.371(4)(b)(3), -(4)(c)(8), -(4)(g), -(11), -(14)(h), 104.188(2); *see*

*also* DE 283 at 36–39.[1]  Florida's Attorney General and Secretary of State (collectively, the "State") have filed a motion to stay that injunction pending appeal. After careful consideration, we **GRANT** that motion.[2]

## I.    FACTUAL AND PROCEDURAL HISTORY

The Florida Legislature recently passed H.B. 1205, which reforms the procedures governing Florida's citizen-initiative process for constitutional amendments.  The legislatively expressed purpose of this bill was to combat "fraud related to the process of gathering signatures on petitions for constitutional amendments."  H.B. 1205, 127th Leg., Reg. Sess. § 1 (Fla. 2025).

In passing H.B. 1205, the Florida Legislature did not act in a vacuum.  Instead, in a series of prefatory findings, the Legislature detailed Florida's experience during the last election cycle that gave rise to this legislation, noting that "investigations conducted by the [Florida Department of State] Office of Election Crimes and Security have shown that agents of political committees sponsoring initiative petitions engaged in illegal and fraudulent activities while

---

[1] Citations correspond to the district court's docket below.

[2] We write only to explain our reasoning for granting the stay.  "Because an 'order concerning a stay is not a final adjudication of the merits of the appeal, the tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case.'"  *League of Women Voters of Fla., Inc.*, v. *Fla. Sec'y of State* (*League of Women Voters I*), 32 F.4th 1363, 1369 n.1 (11th Cir. 2022) (alterations adopted) (quoting *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1280 n.1 (11th Cir. 2020)).

gathering petition signatures in the lead-up to recent elections," including "numerous instances of petition circulators being paid per signature, signing petition forms on behalf of deceased individuals, forging or misrepresenting voter signatures on petition forms, using voters' personal identifying information without consent, committing perjury, and swearing false oaths." *Id.* at 10–11.

For example, the Legislature noted that evidence provided to the Office of Election Crimes and Security "by supervisors of elections in several counties showed that petition circulators submitted petition forms on behalf of more than 50 deceased Floridians," while evidence provided by "multiple supervisors of elections and individual Florida voters showed that petition circulators committed perjury and swore false oaths by distributing petition forms with pre-signed attestations to groups of unregistered circulators, who then obtained signatures outside the registered circulator's presence." *Id.* at 12–13. Investigations also "revealed that after petition forms were signed and submitted by voters, petition circulators tampered with the signed forms by using a website to obtain missing personal information, and then filled in the incomplete petition forms." *Id.* at 13.

The Legislature also noted that "evidence showed that petition circulators were able to obtain the four necessary elements of personal identifying information required on petitions—name, address, voter registration number or birthdate, and signature—using publicly available date to commit identity theft and complete dozens, hundreds, or even thousands of petitions without ever actually

circulating a petition." *Id.* And "the Office of Election Crimes and Security received complaints from many Florida voters whose information was fraudulently submitted on forms for at least four initiative petitions circulated for inclusion in the 2024 General Election," with "many of those complaints ar[ising] because some supervisors of elections notified a voter when a petition form bearing his or her name was rejected, which prompted such voters to contact the supervisor of elections or the Office of Election Crimes and Security to report potential fraud." *Id.* at 13–14.

Finally, the Legislature noted that, despite the duties imposed by Florida law on sponsors of initiative petitions, some sponsors "have failed to cooperate with investigations," "have attempted to deflect responsibility for the actions of petition circulators to contractors and subcontractors, with the sponsors denying that they have custody or control of documents requested by state officials," and "have blatantly attempted to evade investigation by delegating key aspects of petition activities to out-of-state entities, who then subcontracted with other individuals who were even further outside the reach of Florida authorities." *Id.* at 12.

In response to evidence of fraud in the initiative process coupled with a lack of cooperation from initiative sponsors, H.B. 1205, among other things, bars any person not registered as a "petition circulator" from collecting, delivering, or physically possessing more than 25 signed petition forms other than a personal form or the form of an immediate family member. Fla. Stat. § 100.371(4)(a). The bill also provides that a person "may not

collect signatures or initiative petitions" if she is "not a citizen of the United States" or is "not a resident" of Florida, *id.* § 100.371(4)(b)(2)–(3), and that all applicants must attest to their citizenship and residency to become a registered petition circulator, *id.* § 100.371(4)(c)(7)–(8). Any "signed petition form submitted by an ineligible or unregistered petition circulator" is to be deemed invalid and not counted "toward the number of necessary signatures for placement on the ballot." *Id.* § 100.371(h)(14).

H.B. 1205 also establishes penalties for sponsoring organizations and circulators that violate the law. A sponsor that knowingly uses ineligible circulators may be fined "$50,000 for each person . . . [who] collect[s] petition forms," and faces a civil action instituted by the Attorney General unless that sponsor "reports the violation as soon as practicable" to the Secretary of State. *Id.* § 100.371(4)(g), -(11). And any person who "is not registered as a petition circulator" and "collects, delivers, or otherwise physically possesses more than 25 signed petition forms," excluding forms that are personal or belong "to an immediate family member," commits a third-degree felony. *Id.* § 104.188(2).

Several interest groups, voting-rights organizations, and individuals sued the Florida officials responsible for administering and enforcing H.B. 1205, challenging the constitutionality of the residency and citizenship requirements under the First Amendment.[3] On July 8, 2025—one day before H.B. 1205 was set to take

---

[3] The plaintiffs also challenged H.B. 1205's affidavit requirement for petition circulators, registration requirement for petition circulators, and 90-day

effect—the district court entered a preliminary injunction enjoin-
ing the officials from enforcing the residency and citizenship re-
quirements against several plaintiffs.[4] According to the district
court, those requirements impermissibly burden the "circulation of
petitions," which constitutes "core political speech," thus trigger-
ing strict scrutiny. *See* DE 283 at 19 (quoting *Meyer v. Grant*, 486
U.S. 414, 421–22 (1988)). Although the district court recognized
that Florida's proffered interest of "investigating and combatting
fraud in the initiative process" was "compelling," it ultimately con-
cluded that the residency and citizenship requirements were not
"narrowly tailored" to furthering that end, finding that less-burden-
some alternatives remained available to Florida. *Id.* at 26–28. After
concluding that the balance of the equities also supported the plain-
tiffs, the district court granted the motion and enjoined the enforce-
ment of the residency and citizenship requirements against the rel-
evant parties.

Both sides appealed the district court's preliminary injunc-
tion order. The State has also filed a motion to stay the preliminary
injunction pending appeal. That motion is now ripe for review.

---

moratorium on verifying applications. *See* Fla. Stat.
§ 100.371(3)(d), -(4)(a), -(14)(e). The district count declined to enjoin the en-
forcement of those provisions, so they are not at issue here. DE 283 at 3–7,
28–30.

[4] The preliminary injunction extends only to Plaintiffs Smart & Safe Florida,
Florida Decides Healthcare Inc., Florida Right to Clean Water, Melissa Martin,
the League of Women Voters of Florida, and the League's Education Fund.

## II.     STANDARD OF REVIEW

In considering whether to stay a preliminary injunction, we apply the standards of review governing our review of the merits of the preliminary injunction. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1317 (11th Cir. 2019). We thus examine the district court's grant of the preliminary injunction for "abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact." *Id.*

## III.     ANALYSIS

The State requests that we stay the preliminary injunction of H.B. 1205's residency and citizenship requirements pending resolution of their appeal on the merits. "Under the 'traditional standard for a stay,' we 'consider four factors: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State* (*League of Women Voters I*), 32 F.4th 1363, 1371 (11th Cir. 2022) (citation modified) (quoting *Nken v. Holder*, 556 U.S. 418, 425–26 (2009)).[5] "The first two factors"—likelihood of success on the

---

[5] This standard may be relaxed in special circumstances not immediately relevant here. *See League of Women Voters I*, 32 F.4th at 1370 ("For example, in some circumstances—namely, 'when the balance of equities . . . weighs heavily in favor of granting the stay'—we relax the likely-to-succeed-on-the-merits requirement. . . . [T]he 'traditional test for a stay' likewise 'does not apply' in the particular circumstance that this case presents—namely, 'when a lower

merits and irreparable injury—"are the most critical." *Swain v. Junior*, 32 F.4th 1363, 1370 (11th Cir. 2020).

Our analysis of the State's motion proceeds in two parts. First, we review the merits of the State's position that the residency and citizenship requirements of H.B. 1205 do not violate the First Amendment; we conclude that the State is likely to prevail on this argument in its appeal. Second, we review the remaining stay factors, finding that these also weigh in favor of the State. The State is thus entitled to a stay of the preliminary injunction.

## A.     The State Is Likely to Succeed on the Merits.

We begin with the district court's determination that H.B. 1205's residency and citizenship requirements trigger, and fail, strict scrutiny. States retain "broad power . . . to institute procedures governing their own initiative processes," and regulations protecting the integrity of the initiative process are "subject to strict scrutiny only in certain narrow circumstances." *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996); *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 191 (1999) (recognizing that states "have considerable leeway to protect the integrity and reliability of the initiative process"). We have recognized that strict scrutiny may be appropriate if a regulation is "content based or had a disparate impact on certain political viewpoints," is enforced "in

---

court has issued an injunction of a state's election law in the period close to an election.'" (first quoting *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986); then quoting *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring))).

a discriminatory manner," or amounts to an impermissible burden on "the free exchange of ideas about the objective of an initiative proposal." *Biddulph*, 89 F.3d at 1500. But "[m]ost restrictions a state might impose on its initiative process would not implicate First Amendment concerns." *Id.*

The district court determined that the residency and citizenship requirements posed "a broad restriction on core political speech," and thus applied strict scrutiny. DE 283 at 21–24. It based this finding on the Supreme Court's observations in *Meyer v. Grant*, 486 U.S. 414 (1988), and *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999), that "the circulation of a petition . . . is appropriately described as 'core political speech.'" *Meyer*, 486 U.S. at 421–22; *accord Buckley*, 525 U.S. at 186. The restrictions at issue in those cases, however, are distinct from, and sweep far more broadly than, those challenged here.

In *Meyer*, the Supreme Court struck down a law prohibiting compensation "in consideration of or as an inducement to the circulation of an initiative or referendum petition," *Meyer*, 486 U.S. at 416 n.1 (quotation omitted), which the Court interpreted to include "persuad[ing] [voters] that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate," *id.* at 421. Because the regulated conduct would "in almost every case involve an explanation of the nature of the proposal and why its advocates support it," the *Meyer* Court found the law to impermissibly burden the "interactive communication concerning political change" at the core of protected

political speech. *Id.* at 421–22. In turn, the *Buckley* Court relied on *Meyer* to invalidate a law that required a "petition for any initiative or referendum measure . . . be circulated by . . . a registered elector," *Buckley*, 525 U.S. at 188 n.2 (quotation omitted), concluding it posed an "undue hindrance[ ] to political conversations and the exchange of ideas" that "significantly inhibit[ed] communication with voters about proposed political change," *id.* at 192 (citing *Meyer*, 486 U.S. at 421).

We read *Meyer* and its progeny as requiring "exacting" or strict scrutiny of a law regulating the initiative process only if the challenged law "substantially restricts *political discussion* of the issue [the sponsor] is seeking to put on the ballot." *See Biddulph*, 89 F.3d at 1498 (emphasis added); *see also Brown v. Yost*, 122 F.4th 597, 611 (6th Cir. 2024) (Thapar, J., concurring) ("*Buckley* thus stands for the unremarkable proposition that regulations of political expression trigger First Amendment scrutiny."). That simply is not the case here.

H.B. 1205's residency and citizenship requirements do not restrict any speech elements of the petition-circulation process. Instead, they only regulate who can "collect signatures or initiative petitions," Fla. Stat. § 100.371(4)(b)—i.e., who may "collect, deliver, or otherwise physically possess" forms that are already "signed," *see id.* § 100.371(4)(a). H.B. 1205 does not bar noncitizens or nonresidents from distributing petition forms to Florida voters, *see id.* § 100.371(e), or from otherwise engaging those voters in "informative and perhaps persuasive speech seeking support for particular

causes or for particular views on economic, political, or social is-
sues," *Meyer*, 486 U.S. at 422 n.5 (quotation omitted).  And these
restrictions kick in only *after* a voter has been convinced to sign the
petition form.  *See Buckley*, 525 U.S. at 200 (explaining that regula-
tions having effect "only after circulators have completed their con-
versations with electors . . . [are among] the type of regulation"
that does not trigger strict scrutiny).  Accordingly, the residency
and citizenship requirements neither limit the "number of voices
who will convey [the sponsors'] message" nor curtail "the size of
the audience they can reach," and thus do not implicate "the type
of interactive communication concerning political change . . . de-
scribed as 'core political speech'" by the *Meyer* Court.  *See Meyer*,
486 U.S. at 421–23.

   We recognize that our sister circuits are divided as to
whether *Meyer* requires that residency restrictions for petition cir-
culators trigger heightened First Amendment scrutiny.  *Compare,
e.g.*, *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388–96 (5th Cir. 2013)
(declining to apply heightened scrutiny); and *Initiative & Referen-
dum Inst. v. Jaeger*, 241 F.3d 614, 617 (8th Cir. 2001) (same), *with Yes
On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1027–28 (10th Cir. 2008)
(applying strict scrutiny); *We the People PAC v. Bellows*, 40 F.4th 1, 19–
21 (1st Cir. 2022) (same); *Libertarian Party of Va. v. Judd*, 718 F.3d
308, 317 (4th Cir. 2013) (same); *Nader v. Blackwell*, 545 F.3d 459, 475–
76 (6th Cir. 2008) (same); *Nader v. Brewer*, 531 F.3d 1028 (9th Cir.
2008) (same); and *Pierce v. Jacobsen*, 44 F.4th 853, 862–63 (9th Cir.
2022) (same).  Contrary to the district court's observation other-
wise, *see* DE 283 at 20–21, the statutes at issue in many of these

cases are hardly "analogous" to H.B 1205, as they "fully exclude[ ] all persons who . . . are not [in-state] residents from engaging in petition circulation" as such. *Pierce*, 44 F.4th at 860; *see Savage*, 550 F.3d at 1029; *Bellows*, 40 F.4th at 5; *Brewer*, 531 F.3d at 1031; *Blackwell*, 545 F.3d at 473. The provisions challenged here apply only to individuals who physically possess more than 25 already-signed petition forms, and thus are more like the Texas law prohibiting non-residents from "receiv[ing] and deliver[ing] [completed] voter registration forms" challenged in *Steen*—a law the Fifth Circuit found did not implicate the First Amendment at all. *Steen*, 732 F.3d at 389; *see also id.* at 390 ("Logically, what the [circulator] does with the voter's form *follows* the voter's completion of the application but is not itself 'speech.' One does not 'speak' in this context by handling another person's 'speech.'").

Regardless, none of these cases is binding on us. But *Biddulph* is. And *Biddulph* limits strict scrutiny to instances where the law "substantially restricts political discussion." 89 F.3d at 1498. Since the post-signature residency and citizenships provisions of H.B. 1205 do not do that, we must conclude strict scrutiny does not apply here. *See Gissendaner v. Ga. Dep't of Corr.*, 779 F.3d 1275, 1284 (11th Cir. 2015) ("Until the Supreme Court issues a decision that actually changes the law, we are duty-bound to apply this Court's precedent.").

The dissent attempts to distinguish *Biddulph* by noting that case "implicated the procedure surrounding the eligibility of the initiative to be placed on the ballot, not an individual's First

Amendment right to participate in the ballot initiative process in the first place." Dissenting Op. at 15. But even under the latter scenario, *Biddulph* instructs that *heightened* First Amendment scrutiny is not required "[a]bsent some showing that the initiative process substantially restricts *political discussion* of the issue." *Biddulph*, 89 F.3d at 1498 (emphasis added); *see Buckley*, 525 U.S. at 192 (applying heightened scrutiny where restrictions "significantly inhibit communication with voters about proposed political change"); *cf. Bucklew v. Precythe*, 587 U.S. 119, 136 (2019) ("[J]ust as binding as [a] holding is the reasoning underlying it."). And nothing in H.B. 1205 limits a nonresident or noncitizen from speaking to and attempting to persuade a Florida voter on any political issue whatsoever. So while the dissent may view H.B. 1205 as a "sweeping bar on political participation," *see* Dissenting Op. at 16, the law does not sweep into any aspects of the circulation process that actually implicate "the exchange of ideas about political change." *Biddulph*, 89 F.3d at n.7 (citing *Meyer*, 486 U.S. at 422). Those attempts to persuade a Florida voter occur before—not after—the voter decides to sign a petition form.

The dissent is therefore wrong to conclude that *Meyer*, without more, is fatal to H.B. 1205. While some provisions of H.B. 1205 and the Colorado law at issue in *Meyer* are comparable—for example, they both provide a "criminal sanction," *see* Dissenting Op. at 16; *compare* Fla. Stat. § 104.188(2); *with* Colo. Rev. Stat. § 1-40-110 (1980)—these statutes differ on the key element for our First Amendment analysis: the extent to which the restriction infringes the "interactive communication" at the "core" of political speech.

*Meyer*, 486 U.S. 421–22. As the Court explained in *Meyer*, Colorado's law worked to inhibit individuals in "persuad[ing] [others] that the matter is one deserving of the public scrutiny and debate that would attend its consideration by the whole electorate." *Id.* H.B. 1205, by contrast, provides no bar on a person's ability or opportunity to provide to others an "explanation of the nature of the proposal and why its advocates support it." *Id.* at 421. We therefore must venture beyond *Meyer's* "unremarkable proposition that regulations of political expression trigger First Amendment scrutiny" to properly assess the constitutionality of H.B. 1205. *See Brown*, 122 F.4th at 611 (Thapar, J., concurring).

At most, Florida's rules for nonresidents and noncitizens "collect[ing], deliver[ing], or otherwise physically possess[ing]" signed petition forms regulate only expressive conduct. *See* Fla. Stat. § 100.371(4)(b). We say "at most" because we are skeptical that the challenged provisions implicate the First Amendment at all. As the collection, delivery, and physical possession of signed petitions do not implicate the "written or spoken word," *Texas v. Johnson*, 491 U.S. 397, 406 (1989), the challenged provisions only trigger First Amendment scrutiny if such conduct is "inherently expressive," *Rumsfeld v. F. for Acad. & Inst. Rgts., Inc.*, 547 U.S. 47, 66 (2006); *see also Johnson*, 491 U.S. at 406 ("The government generally has a freer hand in restricting expressive conduct than it has in restricting the written or spoken word." (citing *United States v. O'Brien*, 391 U.S. 367, 376–377 (1968); *Clark v. Cmty. for Creative Non-*

16                          Order of the Court                          25-12370

*Violence*, 468 U.S. 288, 293 (1984); and *Dallas v. Stanglin*, 490 U.S. 19, 25 (1989))).

Although the Supreme Court has suggested that certain conduct inherent to the circulation process can bear expressive elements, *see Meyer*, 486 U.S. at 421 ("The circulation of an initiative petition of necessity involves . . . the expression of a desire for political change"), it is not readily apparent whether carrying sheets of paper from one place to another—without more—would allow the reasonable observer to apprehend that the carrier intended to express "some sort of message" by doing so.  *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004); *cf. Steen*, 732 F.3d at 391 (holding residency requirement did not trigger First Amendment scrutiny because it "[did] not in any way restrict or regulate who can advocate pro-voter-registration messages, the manner in which they may do so, or any communicative conduct"); *Brown*, 122 F.4th at 609 (Thapar, J., concurring) (concluding laws that do not "directly regulate political speech made within the initiative process" should not be subject to First Amendment scrutiny).  If the regulated conduct is not inherently expressive, then the residency and citizenship requirements need only be reviewed for a rational basis, *see Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 359 (2009), even if these restrictions "impos[e] incidental burdens on speech," *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  We leave this threshold question to the merits panel, however, since we are satisfied that the State is likely to prevail regardless of whether rational-basis review or intermediate scrutiny applies.

Indeed, assuming for now that the collection, delivery, and physical possession of signed petitions *do* constitute inherently expressive conduct, we conclude that the State is still likely to succeed on the merits. When, as here, both "'speech' and 'nonspeech' elements" are combined in the same course of conduct, and "the governmental interest is unrelated to the suppression of free expression," *O'Brien*, 391 U.S. at 376–77; *cf.* H.B. 1205, § 1 (asserting Florida's interest of combatting "fraud"), a "sufficiently important governmental interest in regulating the nonspeech element can justify incidental limitations on First Amendment freedoms," *O'Brien*, 391 U.S. at 376; *see Wirzburger v. Galvin*, 412 F.3d 271, 279 (1st Cir. 2005) (applying *O'Brien* to review initiative regulation that was "not aimed at regulating speech" but still "affected" expression).[6] The

---

[6] We think *O'Brien* is a better doctrinal fit than the *Anderson-Burdick* balancing test used to evaluate ballot-access restrictions. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983); *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Lee*, 915 F.3d at 1318 ("That test requires us to weigh the character and magnitude of the asserted First and Fourteenth Amendment injury against the state's proffered justifications for the burdens imposed by the rule, taking into consideration the extent to which those justifications require the burden to plaintiffs' rights."). That test "is not appropriate" in the free-speech context. *Biddulph*, 89 F.3d at 1500 n.10; *see also Lichtenstein v. Hargett*, 83 F.4th 575, 593–94 (6th Cir. 2023) (declining to apply *Anderson-Burdick* balancing test in favor of "traditional speech rules"). Because the district court limited its analysis of the First Amendment harm to the speech issue, *see* DE 283 at 18–28, *Anderson-Burdick* is not appropriate here either. And we are not bound to apply the wrong legal standard simply because the parties ask us to. *See Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 n.8 (11th Cir. 2022) (en banc) ("We are duty bound to apply the correct law; 'parties cannot waive the application of the correct law or stipulate to an incorrect legal test.'" (first quoting *Jefferson*

State is substantially likely to demonstrate that the residency and citizenship restrictions survive such intermediate scrutiny. Florida undoubtedly has a sufficiently important, and even (as recognized by the district court) a "compelling," interest in combatting fraud in the petition-initiative process. *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). And H.B. 1205's chosen means are "substantially related to the important interest of preserving the integrity of the electoral process," *Doe v. Reed*, 561 U.S. 186, 199 (2010), since the residency and citizenship requirements' "incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest," *see O'Brien*, 367 U.S. at 377; *see also United States v. Albertini*, 472 U.S. 675, 689 (1985) (explaining *O'Brien*'s tailoring requirement is met as long as the government's interest "would be achieved less effectively absent the regulation").

Florida has put forth ample evidence demonstrating that its efforts to prevent and probe fraud are undercut by sponsors "delegat[ing] key aspects" of the processes to "out-of-state entities" and their subcontractors, as it is "incredibly difficult for investigators and law enforcement to investigate" misfeasors beyond Florida's jurisdictional reach. DE 103-2 at 8, 16–20. The district court believed, however, that the availability of "narrower solutions" to that problem foreclosed the viability of Florida's "complete ban." DE 283 at 27. But the mere availability of alternative solutions "that might be less burdensome on speech" does not necessarily mean the

---

*v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018); then citing *United States v. Lee*, 29 F.4th 665, 669 n.2 (11th Cir. 2022))).

government's chosen method violates the First Amendment. *Albertini*, 472 U.S. at 689 (citing *Clark*, 468 U.S. at 299); *see also id.* ("The validity of such regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests."). And the alternatives proffered by the district court do not even address the specific problems Florida seeks to ameliorate. *Cf. Pierce*, 44 F.4th at 863 n.7 ("If a state provided adequate evidence that other methods . . . would be insufficient to further its interest in fraud prevention, it is possible that a residency requirement could survive [heightened scrutiny].").

For instance, the district court recommended that Florida officials try "issuing subpoenas to out-of-state nonparties to assist in investigations." DE 283 at 27. Florida has tried that. Doing so has proven futile, however, as Florida's "ability to execute [subpoenas] has been hampered by the fact that [the out-of-state entity]" often has "few if any ties to Florida," making it difficult for authorities to locate "key suspects and witnesses." DE 103-2 at 8 (alteration adopted). Nor would "strengthening corporate registration requirements and accounting mechanism[s]" solve Florida's difficulties with monitoring and holding accountable individual, out-of-state subcontractors.[7] DE 283 at 27; *see* DE 267-2 ¶¶ 10–16. We

---

[7] Contrary to the district court, we see no reason why Florida's difficulties in investigating out-of-state circulators would be limited only to instances of "pay-per-signature schemes." DE 283 at 25–27. Although Florida has observed that such schemes are "likely driving the petition fraud" in the state, Florida need not wait for further abuse before taking action to protect the

also fail to see how issuing a subpoena or expanding corporate reg-
istration would allow Florida to effectively respond to individual
noncitizen-circulators abruptly leaving the country without turn-
ing in election forms in their possession "on time."[8]

The State has made a strong showing that H.B. 1205's resi-
dency and citizenship requirements likely do not violate the First
Amendment, since Florida's substantial interest in preventing and
investigating instances of voter fraud "would be achieved less ef-
fectively" without them. *Albertini*, 472 U.S. at 689. In any event,
the district court erroneously subjected the challenged

---

integrity of its initiative process. *See, e.g.*, *Munro v. Socialist Workers Party*, 479
U.S. 189, 195 (1986) ("Legislatures, we think, should be permitted to respond
to potential deficiencies in the electoral process with foresight rather than re-
actively.").

[8] The district court dismissed the Florida Legislature's concern with its ability
to curtail voting misconduct by noncitizens, finding it was based only on "iso-
lated instances of non-citizens allegedly behaving badly in other contexts
within the universe of election regulations." DE 283 at 27. But "our precedent
does not require evidence of voter fraud to justify adopting legislation that
aims to prevent fraud." *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of
State* (*League of Women Voters II*), 66 F.4th 905, 925 (11th Cir. 2023); *Greater Bir-
mingham Ministries v. Ala. Sec'y of State*, 992 F.3d 1299, 1334 (11th Cir. 2021)
("[T]he Supreme Court has already held that deterring voter fraud is a legiti-
mate policy on which to enact an election law, even in the absence of any
record evidence of voter fraud."); *see also Lichtenstein*, 83 F.4th at 597 ("[T]he
government . . . need not make an 'evidentiary showing' that the harm caused
by the prohibited conduct is 'real.' . . . Nor must it prove that the specific con-
duct of a 'particular' challenger will cause this harm." (first quoting *City of Erie
v. Pap's A.M.*, 529 U.S. 277, 299 (2000) (plurality opinion); then quoting *Alber-
tini*, 472 U.S. at 688)).

provisions—which do not substantially restrict "core political speech," *Biddulph*, 89 F.4d at 1498 (quoting *Meyer*, 486 U.S. at 422)—to strict scrutiny.  Thus, it necessarily abused its discretion in enjoining their enforcement.  *See Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020); *see also New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1289 (11th Cir. 2020) (Lagoa, J., concurring) ("By pointing out how the district court has misapplied the law, the State has more than carried its burden on the first and foremost factor required for a stay.").  We thus hold that the State has satisfied the first condition for a stay.

**B.    The State Meets the Remaining Conditions for a Stay.**

Having determined that the State is likely to succeed on the merits of its appeal, we now must consider whether it also "will be irreparably injured absent a stay," whether the stay would "substantially injure" the other parties, and the extent to which a stay accords with the "public interest."  *League of Women Voters I*, 32 F.4th at 1371.

The State would be irreparably harmed were we to allow an injunction against Florida's restrictions on the initiative process to remain in place.  *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018) (citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers)).  By contrast, the Appellees suffer no cognizable injury in having to comply with a duly enacted law that is substantially likely to withstand constitutional scrutiny following this appeal.  *See Little v. Reclaim Idaho*, 140 S. Ct. 2616 (2020) (Roberts, C.J., concurring) ("Even assuming that the state laws at issue implicate the First

Amendment, such reasonable, nondiscretionary restrictions are almost certainly justified by the important regulatory interests in combating fraud."); *Garcia-Mir v. Meese*, 781 F.2d 1450, 1457 (11th Cir. 1986) (concluding balance of equities favored government where any injury to the plaintiffs would "only arise if the constitutional right the trial court recognized actually obtains for [them]"). A stay of the injunction is also in the public interest, since allowing the enforcement of H.B. 1205's residency and citizenship requirements pending appeal will let Florida continue its legitimate effort to "prevent[ ] voter fraud" and "promote[ ] confidence in our electoral system—assuring voters that all will play by the same, legislatively enacted rules." *Raffensperger*, 976 F.3d at 1284.

The State has thus shown that the balance of the equities tips in its favor. Absent a stay of the preliminary injunction, Florida would be left unable to enforce H.B. 1205's rules governing the collection of initiative petitions until this appeal is resolved on the merits—rules that were legitimately "enacted by representatives of its people" and that are substantially likely to be upheld as constitutional. *King*, 567 U.S. at 1302–03. In the circumstances of this case, we conclude that the State is entitled to a stay.

## IV.    CONCLUSION

For the reasons stated, we **GRANT** the State's motion to stay the July 8, 2025, preliminary injunction pending appeal.

**MOTION GRANTED.**

25-12370                    ABUDU, J., dissenting                    1

ABUDU, Circuit Judge, dissenting:

> The very purpose of the First Amendment is to fore-
> close public authority from assuming a guardianship
> of the public mind . . . .   In this field every person
> must be his, [her, or their] own watchman for truth,
> because the forefathers did not trust ***any*** government
> to separate the true from the false for us.

*Thomas v. Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring)
(emphasis added).

## I.    Introduction

The political debates that citizen initiatives, and by extension
the circulation of petitions, generate involve core political speech.
Organizations like the Plaintiff-Appellees in this case gain support
for their political positions by engaging in direct contact with vot-
ers, discussing the legal changes and policy goals their initiatives
seek to advance, and encouraging voters to participate in the elec-
toral process for their own benefit and society as a whole.  Florida,
never one to run out of ideas on how to restrict access to the ballot
box and voter engagement, has crafted yet another scheme to limit
the ability of their constituent opponents to express their beliefs
and to challenge the status quo.  *See Democratic Exec. Comm. of Fla.
v. Lee*, 915 F.3d 1312, 1325 (11th Cir. 2019) ("We conclude on this
record that the serious burden on voters outweighs Florida's iden-
tified interests . . . ."); *Honeyfund.com v. Governor of Fla.*, 94 F.4th
1272, 1278–83 (11th Cir. 2024) (striking down a recently-enacted
Florida law as a viewpoint-based restriction on speech); *see also id.*

at 1275 ("[W]e reject this latest attempt [by Florida] to control speech by recharacterizing it as conduct."). In this case, the district court engaged in a thoughtful and thorough examination of Supreme Court precedent to temporarily block the State's efforts to curtail political speech through its passage and enforcement of H.B. 1205. Because *Meyer v. Grant*, 486 U.S. 414 (1988) is directly on point, and because the district court's application of that Supreme Court precedent to this case was wholly proper, the State's motion should be denied and the district court should be affirmed, lest Florida be allowed to hamper the Plaintiff-Appellees' fundamental First Amendment rights in this violative way.

　　H.B. 1205 bars non-residents of Florida and individuals who are not U.S. citizens, even if they are lawful permanent residents, from participating in the signature-collection process for citizen ballot initiatives by serving as petition circulators. H.B. 1205 § 6, 2025 Leg. (Fla. 2025). If these individuals collect, deliver, or physically possess more than 25 signed petition forms, they can be criminally charged with a felony. Fla. Stat. § 104.188.[1] If a sponsor group knowingly allows a barred individual to collect petitions, they can face a $50,000 fine. Fla. Stat. § 100.371(4)(g).

---

[1] The statute provides an exception, not relevant to this appeal, which is that a "person" can "collect[], deliver[], or otherwise physically possess" their own signed petition form or a signed petition form belonging to that person's "immediate family member" that does not count toward this 25 petition limit. Fla. Stat. § 104.188.

25-12370          ABUDU, J., dissenting          3

Plaintiff-Appellees include non-profit organizations dedicated to promoting affordable health care for all Floridians regardless of economic status (Florida Decides Healthcare, Inc.); reforming drug sentencing laws (Smart & Safe Florida); and protecting people from hazardous chemicals in our drinking water (Florida Right to Clean Water).  They each seek to place on the 2026 ballot proposed constitutional amendments that, in their view, will help elevate the concerns of lower-income individuals who are the most negatively impacted by the current laws and policies surrounding these issues.  Given H.B. 1205's residency and citizenship restrictions on who the Plaintiff-Appellees can hire, their ability to effectively advocate for political change is severely hampered—an impact far more severe than permissible under the Supreme Court's allowance of narrowly-tailored restrictions on fundamental rights.  *See Meyer*, 486 U.S. at 425 ("[T]he statute trenches upon an area in which the importance of First Amendment protections is 'at its zenith.'  For that reason the burden that [the state] must overcome to justify this criminal law is well-nigh insurmountable.").

As a result of H.B. 1205, Plaintiff-Appellees have had to fire hundreds of people in an already tight economy; their capacity to hire qualified individuals within the necessary timeline to meet ballot initiative submission deadlines has been curtailed; and those who support their political efforts have been chilled from participating in the ballot initiative process.  When faithfully analyzing the four factors courts must consider when deciding whether to grant a preliminary injunction, there is no question that at this

stage in the litigation, the Plaintiff-Appellees have satisfied those factors.  The State, on the other hand, does not have the law on its side.  Instead, it benefits from an ongoing trend in this Court to ignore the abuse of discretion standard and the stronger legal arguments.

## II.    What Happened to the Standard of Review?

We review a district court's grant or denial of a preliminary injunction for abuse of discretion.  *Lee*, 915 F.3d at 1317.  Judge Jordan said it best when he opined that, "ignoring and/or revising the district court's factual findings and failing to apply the clear error standard—is seemingly becoming habit in this circuit."  *Otto v. City of Boca Raton*, 41 F.4th 1271, 1285 (11th Cir. 2022) (Jordan, J., dissenting from the denial of reh'g).  So, too, is the ongoing habit of disingenuously parsing Supreme Court precedent to accommodate a State's unconstitutional legislative whims.  In this case, the district court's factual findings regarding H.B. 1205's practical impact, its legal insufficiency, and the concrete harms it causes are due deference.  Borrowing from my experienced colleague Judge Tjoflat's model, perhaps a "primer" is in order.  *See, e.g.*, *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1245 (11th Cir. 2025) (Tjoflat, J., concurring in part and dissenting in part) ("A Primer on Standing").

A district court may grant a preliminary injunction if a movant shows: "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and

25-12370                ABUDU, J., dissenting                5

(4) if issued, the injunction would not be adverse to the public interest." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). A preliminary injunction is a significant remedy, so the movant bears the burden to show that these prerequisites are met. *Id.* One important function of a preliminary injunction "is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Att'y Gen.*, 957 F.3d 1171, 1178 (11th Cir. 2020) (quoting *Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)); *see also Vital Pharms., Inc. v. Alfieri*, 23 F.4th 1282, 1290 (11th Cir. 2022) ("[A] preliminary injunction is meant to keep the status quo for a merits decision, not to replace it." (citation omitted)). That is because, "in granting a preliminary injunction," a district court does "not definitively rule on the merits of the case." *Robinson*, 957 F.3d at 1177. We also do not do so when we rule on whether a stay is appropriate. *See id.*; *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. . . . In light of these considerations, it is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."). The abuse of discretion standard of review is deferential, and "there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." *Rasbury v. IRS (In re Rasbury)*, 24 F.3d 159, 168 (11th Cir. 1994). "[T]he abuse of discretion standard allows 'a range of choice for the district court, so long as that choice does not constitute a clear error of judgment.'" *Id.*

(quoting *United States v. Kelly*, 888 F.2d 732, 745 (11th Cir. 1989)).  A district court abuses its discretion if it commits an error of law or relies on clearly erroneous facts.  *Lee*, 915 F.3d at 1317.

When we review factual findings for clear error, our review is very deferential.  *OHI Asset (VA) Martinsville SNF, LLC v. Wagner (In re Wagner)*, 115 F.4th 1296, 1303 (11th Cir. 2024).  We may not set aside a finding of fact when it is supported by the testimony of witnesses who "told a coherent and facially plausible story that is not contradicted by extrinsic evidence."  *Id.* (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 575–76 (1985)); *see also United States v. Saingerard*, 621 F.3d 1341, 1343 (11th Cir. 2010) (explaining when a factfinder chooses between two permissible views of the evidence, its findings are not clearly erroneous).  We are not supposed to re-determine the facts for ourselves.

In ruling on a motion for a stay pending appeal, these standards layer atop one another.  A stay is an equitable remedy, *see Woods v. Warden, Holman Corr. Facility*, 951 F.3d 1296, 1298—99 (11th Cir. 2020), and it "is not available as a matter of right," *id.* (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)).  To determine whether a stay is appropriate we ask "(1) whether the stay applicant"—the State here—"has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."  *Nken v. Holder*, 556 U.S. 418, 434 (2009) (citation omitted).  In this posture, the State, as the

movant, bears the burden to show a stay is warranted. Fed. R. App. P. 27(a)(2)(A); *Nken*, 556 U.S. at 433–34 ("The party requesting a stay bears the burden of showing that the circumstances justify an exercise of [the court's] discretion."). In assessing whether it has borne its burden, our primary focus is on the first two factors. *Nken*, 556 U.S. at 434.

When courts assess a party's likelihood of success, "it would be a mistake" to "improperly equate[] likelihood of success with success." Samuel L. Bray, *The Purpose of the Preliminary Injunction*, 78 VAND. L. REV. 809, 818 (2025) (internal quotation marks omitted) (quoting *Camenisch*, 451 U.S. at 394). Instead, a likelihood of success is a matter of prediction, not a pure legal question necessarily subject to *de novo* review. Thus, the question is whether the district court's prediction about a plaintiff's likelihood of success was clearly or obviously erroneous. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986) ("A finding that the movant demonstrates a probable likelihood of success on the merits on appeal requires that we determine that the trial court below was clearly erroneous." (citation omitted)); *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1171 (11th Cir. 2002) (explaining that a district court's "judgments, about the viability of a plaintiff's claims and the balancing of equities and the public interest, are the district court's to make and we will not set them aside unless the district court has abused its discretion in making them"); *see also Wood v. Fla. Dep't of Educ.*, 142 F.4th 1286, 1294–95 (11th Cir. 2025) (Jordan, J., dissenting) (collecting cases showing that our review of

"the substantial likelihood of success" prong of the preliminary injunction framework is for abuse of discretion).

Finally, in our rulings—and, indeed, in general—"we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). "[O]ur [legal] system 'is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief.'" *Id.* at 375–76 (alteration adopted) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring)). Therefore, the State cannot be likely to succeed on an issue it never presented before the district court or pressed in its motion to stay on appeal.

In this case, the only way to stay the district court's decision is to: (1) ignore its careful application of prevailing persuasive authority; (2) apply flawed legal reasoning from circuit courts that are clear outliers when it comes to recognizing what constitutes "core political speech"; and (3) disregard the unrefuted factual findings regarding the forms of speech upon which H.B. 1205 encroaches. Unfortunately, that is what the majority does to reach today's result.

## III. Discussion

Unsurprisingly, the State rests its frontline defense on the argument that the challenged provisions in H.B. 1205 cover conduct, not speech, and, therefore, do not implicate the First Amendment. *See* Stay Motion at 11–14. That argument creates an avenue, albeit filled with potholes, through which the State completely vaults

over the clear holding in *Meyer* that the circulation of petitions involves "core political speech."  486 U.S. at 420 ("The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" (citation omitted)).  Even when we disagree with the Supreme Court, we are duty-bound to respect its decisions and the precedent those cases set.  There can be no clearer invitation to the Supreme Court to remedy our Circuit's repeated departure from the language and spirit of the First Amendment, especially in the context of election law.

### A. The State has not established a strong showing that it is likely to succeed on the merits.

The State's argument that the collection of signed petitions is conduct that can be regulated without implicating the First Amendment at all is so severely flawed that the district court really could have just written "*See Meyer*" and ended its opinion there. The Court has never, ever retreated from the basic principle that the Free Speech Clause "affords protection to symbolic or expressive conduct as well as to actual speech." *Virginia v. Black*, 538 U.S. 343, 358 (2003).  *See also Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[C]onduct may be 'sufficiently imbued with elements of communication to fall within the scope of the First and Fourteenth Amendments.'" (citation omitted)); *cf. also Honeyfund.com*, 94 F.4th at 1278

("The comparative freedom to regulate conduct sometimes tempts political bodies to try to recharacterize speech as conduct.").[2]

When determining whether a type of conduct constitutes expressive conduct that the First Amendment protects, we are supposed to apply a two-part inquiry that first asks whether an intent to convey a particular message is present, and then "whether the reasonable person would interpret [the conduct] as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240–41 (11th Cir. 2018) (emphasis in original) (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)). The context is important because the circumstances surrounding the conduct can help distinguish between what is expressive and what is not. *Id.*

---

[2] The State says "It's blackletter law that speech is afforded First Amendment protection. Conduct isn't." Stay Motion at 13. This argument is not likely to succeed because it contradicts the language quoted above from *Johnson* and *Virginia. Cf. Motorcity Ltd. ex rel. Motorcity, Inc. v. Se. Bank N.A.*, 120 F.3d 1140, 1143 (11th Cir. 1997) (*en banc*) ("Only the Supreme Court has 'the prerogative of overruling its own decisions.'" (citation omitted)). The district court noted the same problem with the State's argument. *Fla. Decides Healthcare, Inc. v. Byrd*, No. 4:25-cv-211, 2025 WL 1884799, at *7 n.17 (N.D. Fla. July 8, 2025) (citing *Buckley v. Am. Const. Law Found., Inc.*, 525 U.S. 182, 186 (1999)). The State does not attempt to distinguish this precedent in its Motion. For this reason alone, it has not borne its burden to show a likelihood of success on the argument that the First Amendment does not apply to the plaintiffs' expressive conduct. *See Nken*, 556 U.S. at 433–34; *Murphy v. St. Paul Fire & Marine Ins. Co.*, 314 F.2d 30, 31 (5th Cir. 1963) ("It is elementary that the burden is on the appellants to show error.").

The State cites *Rumsfeld v. Forum for Academic & Institutional Rights, Inc.* ("*FAIR*"), *see* Stay Motion at 13, in which the Supreme Court recognized that some conduct "is not so inherently expressive that it warrants protection," and the fact that "explanatory speech is necessary is strong evidence that the conduct at issue . . . is not so inherently expressive that it warrants protection." 547 U.S. 47, 49, 66 (2006); Stay Motion at 13. Yet, this language from *FAIR* "does not mean that conduct loses its expressive nature just because it is also accompanied by other speech." *Food Not Bombs*, 901 F.3d at 1243–44 (citing *FAIR*, 547 U.S. at 66). Instead, it clarifies that "[t]he critical question is whether the explanatory speech is *necessary* for the reasonable observer to perceive a message from the conduct." *Id.* (discussing *FAIR*, 547 U.S. at 51, 55, 66) (emphasis in original). Indeed, a court errs when it does *not* consider the context in which the conduct occurs because the correct inquiry is whether the whole of the activity could be interpreted as "*some* sort of message." *Id.* at 1242–43 (quoting *Holloman*, 370 F.3d at 1270) (emphasis added). Therefore, *FAIR* does not support the State's proposition that courts should ignore the context of a plaintiff's conduct in assessing whether it is expressive and entitled to First Amendment protection. *See* Stay Motion at 14.

Overall, the State's frontline position represents a drastic departure from First Amendment caselaw and violates the foundational principles upon which the amendment rests. If the State prevails, Florida can now criminalize any expressive activity it chooses on the ground that it is the "conduct" portion and not the "speech" it is targeting. Notably missing from its argument is any discussion

12                    ABUDU, J., dissenting                    25-12370

of *Food Not Bombs*, *Virginia*, or *Johnson*. By failing to provide any support for its argument and by failing to engage with relevant precedent, the State has not shown it will succeed in this appeal. Fed. R. App. P. 27(a)(2)(A); *Nken*, 556 U.S. at 433–34.

The State's alternative position is that, even if H.B. 1205 implicates the First Amendment, any analysis requires "exacting" scrutiny, and that scrutiny does not require narrow tailoring. *See* Stay Motion at 14–15. This argument, while incorrect, at least exposes the weaknesses in the State's purported reasoning that infringing on the free speech rights of issue-oriented organizations somehow advances its efforts to protect the integrity of the ballot initiative process. The State's position also further supports why, given the circuit split on the correct legal standard to employ, the district court's application of *Meyer* and other Supreme Court precedents should be affirmed.

As for the legal standard, six circuits already have concluded that heightened scrutiny applies when analyzing the constitutionality of a scheme that imposes restrictions on the collection of petition signatures. *See Yes On Term Limits, Inc. v. Savage*, 550 F.3d 1023, 1027–28 (10th Cir. 2008) (3-0 decision) (applying strict scrutiny because "the state government here is limiting the quantum of [core political] speech through its residency requirements for petition circulators"); *We the People PAC v. Bellows*, 40 F.4th 1, 19–21 (1st Cir. 2022) (3-0 decision) (concluding that strict scrutiny applies when the effect of the state regulation is to "drastically" limit the number of persons able to circulate petitions, as such a law

25-12370                 Abudu, J., dissenting                 13

"imposes a severe burden on core political speech"); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 316–17 (4th Cir. 2013) (3-0 decision) ("As the law has developed . . . a consensus has emerged that petitioning restrictions like the one at issue here are subject to strict scrutiny analysis."); *Nader v. Blackwell*, 545 F.3d 459, 475–76 (6th Cir. 2008) (Boggs, C.J., lead opinion) ("[P]etition circulation activity constitutes core political speech, and any regulation of that speech is subject to exacting scrutiny." (first citing *Buckley*, 525 U.S. at 192 n.12, and then citing *id.* at 210–11 (Thomas, J., concurring)); *Krislov v. Rednour*, 226 F.3d 851, 862 (7th Cir. 2000) (3-0 decision) (striking down Illinois law imposing a candidate signature-gatherer residency requirement under exacting scrutiny, finding the law "places a substantial burden on the [plaintiffs'] First Amendment rights by making it more difficult for [them] to disseminate their political views, to choose the most effective means of conveying their message, to associate in a meaningful way with the prospective solicitors for the purposes of eliciting political change, [and] to gain access to the ballot . . . ."); *see also id.* at 858 ("[T]he fact that the regulation leaves open other possibilities of expression (circulators who are registered residents) does not mean that the law is not burdensome."); *Nader v. Brewer*, 531 F.3d 1028, 1036 (9th Cir. 2008) (3-0 decision) (explaining that, when a "restriction creates a severe burden on plaintiffs' First Amendment rights, strict scrutiny applies" and the Supreme Court has already held "that significantly reducing the number of potential circulators impose[s] a severe burden on rights of political expression"); *Pierce v. Jacobsen*, 44 F.4th 853, 862–63 (9th Cir. 2022) (3-0 decision) (applying exacting scrutiny to

strike down Arizona law similar to H.B. 1205, reasoning the statute "entirely precludes out-of-state residents from exercising a form of core political speech, reduces the pool of available circulators, and imposes a severe burden" on speech).

Moreover, respectfully, it simply defies logic that cases in which our sister circuits addressed actual challenges to unlawful restrictions on petition circulators are less informative than a case involving a challenge to regulations on voter registration drives, especially when that court itself recognized the factual distinctions between registration drives and the circulation of petitions. *Compare* Maj. Op. at 12, 13, 16, *with Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388–96 (5th Cir. 2013) (2-1 decision) (declining to apply heightened scrutiny, in part because "while voter registration drives involve core protected speech, they *are factually distinct* from the circulation of petitions addressed by the Supreme Court in *Meyer* . . . and *Buckley*" (emphasis added)). *Steen* actually further hurts, rather than helps, the State's position and renders the district court's legal analysis even more sound. When we focus specifically, as we should, on the circulation of petitions, the majority is bringing more attention to our Court as an outlier and, thus, is inviting the Supreme Court to reverse this decision.

The majority's reliance on *Biddulph v. Mortham*, 89 F.3d 1491 (11th Cir. 1996), fares no better. *Biddulph* involved the sponsor of an initiative whose proposal was not included on the ballot because the initiative violated the state's single-subject rule and the title was misleading. 89 F.3d at 1494. In upholding the State's regulation,

our Court recognized the distinction "between regulation of the circulation of petitions—which is 'core political speech'—and a state's general initiative regulations" which is what Biddulph was challenging. *Id*. at 1500–01. Thus, the argument in *Biddulph* implicated the procedure surrounding the eligibility of the initiative to be placed on the ballot, not an individual's First Amendment right to participate in the ballot initiative process in the first place. *See id*. To the extent the *Biddulph* panel identified examples of when strict scrutiny would apply, that list was not exhaustive and certainly would not convert the court's musings into holdings. *United States v. Penn*, 63 F.4th 1305, 1310 (11th Cir.), *cert. denied*, 144 S. Ct. 398 (2023) ("[A]ssumptions are not holdings . . . . [a]nd any answers to questions neither presented nor decided are not precedent." (citations and quotations omitted)).

In *Meyer*, on the other hand, the Supreme Court applied strict scrutiny in striking down a Colorado law making it a felony to pay petition circulators. 486 U.S. at 416. In doing so, the Court explained that "the circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Id*. at 421–22. Colorado's law "restrict[ed] political expression" by "limit[ing] the number of voices who w[ould] convey [the challengers'] message and the hours they can speak . . . ." *Id*. at 422–23. In addition, the law "ma[de] it less likely that [the challengers] w[ould] garner the number of signatures necessary to place the matter on the ballot, thus limiting their ability to make the matter the focus of statewide discussion." *Id*. at 423. Here, the district court determined H.B. 1205

was constitutionally problematic for the same reasons as in *Meyer*. *Florida Decides*, 2025 WL 1884799, at \*8. Given the factual similarities between the unconstitutional laws at issue in *Meyer* and here— including the criminal sanction and a sweeping bar on political participation—the district court did not err, let alone obviously so, in concluding that this case is much more like *Meyer* than *Biddulph*.[3]

In any event, the State also has not shown that H.B. 1205 survives heightened or intermediate scrutiny for the reasons the district court ably explained. Initiative sponsors look for individuals "who can effectively speak with and persuade as many Florida

---

[3] If H.B. 1205 regulates mere conduct and not speech or expressive conduct, as the State argues, it would mean that *Meyer* and *Biddulph* themselves were wrongly decided. In *Biddulph*, we explained that *Meyer* held that "the circulation of initiative petitions and the concomitant exchange of political ideas constitute[d] 'core political speech.'" 89 F.3d at 1498. Therefore, the same two components of circulation activity which the State argues are separate here were tied up, in the *Meyer* Court's view, as explained by *Meyer* and *Biddulph*. In fact, a dissent in the Tenth Circuit in *Meyer* made the same argument the State makes here: Colorado's law "implicate[d] First Amendment rights but proscribe[d] only conduct." *Grant v. Meyer*, 828 F.2d 1446, 1459 (10th Cir. 1987) (*en banc*) (Logan, J., dissenting). When the Supreme Court affirmed and struck down Colorado's law, it necessarily rejected that view. *Meyer*, 486 U.S. at 428.

Moreover, even if *Biddulph* were on point, despite its different facts, the district court acknowledged it and explained why it does not alter its analysis. The court reasoned that "[t]he residency and citizenship requirements challenged here directly implicate that third category of circumstances [from *Biddulph*] warranting heightened scrutiny," namely, H.B. 1205 "impermissibly burdens the free exchange of ideas about the objective of an initiative proposal." *Florida Decides*, 2025 WL 1884799, at \*8 (citing *Biddulph*, 89 F.3d at 1500).

voters as possible to sign their initiative petitions." *Florida Decides*, 2025 WL 1884799, at *8. Given H.B. 1205's restrictions, "the[se] non-resident Plaintiffs are directly prohibited from engaging in core political speech—petition circulation—and the organizational Plaintiffs have lost entire swaths of potential employees and volunteers to this State-imposed silence . . . ." *Id.* In response to this burden on core political speech, the State highlights its interest in combatting fraud. Yet, the district court explained there was "a dramatic mismatch" between that concern and H.B. 1205's purported response to it. *Id.* at *9. It also concluded the evidence showed, at best, "isolated instances of non-citizens allegedly behaving badly in other contexts within the universe of election regulations . . . ." *Id.* at *10. The State has not shown that the district court's factual findings were clearly erroneous, and we have been admonished from placing ourselves, as appellate judges, in a position to reweigh that evidence. *Wagner*, 115 F.4th at 1303 ("The clearly erroneous standard 'does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.'" (quoting *Anderson*, 470 U.S. at 573)); *Robinson*, 957 F.3d at 1177 ("Because a preliminary injunction is reviewed under the deferential abuse of discretion standard, . . . the narrow question for us is whether the state has made a strong showing that the district court abused its discretion." (internal citations omitted)).[4] For these reasons, the State has not borne its

_____

[4] In another deviation from the normal course of appellate review of a preliminary injunction in a stay posture, the Majority concludes that *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968), provides the correct test for analyzing

18                    ABUDU, J., dissenting                    25-12370

burden to show a likelihood of success on appeal.  *Nken*, 556 U.S.
at 433–34.

### B. Irreparable harm and the public interest support the District Court's preliminary injunction.

As explained, the district court's conclusion that the Plaintiff-
Appellees are likely to succeed on the merits was not clearly wrong.
*Garcia-Mir*, 781 F.2d at 1453; *Camenisch*, 451 U.S. at 395.  Given that
the State has no interest in enforcing an unconstitutional law, any
harm it purports to experience does not outweigh the infringement
H.B. 1205 has on the exercise of the Plaintiff-Appellees' "core polit-
ical speech."  *See LaCroix v. Town of Fort Myers Beach*, 38 F.4th 941,
955 (11th Cir. 2022) ("[N]either the government nor the public has
any legitimate interest in enforcing an unconstitutional ordi-
nance."); *KH Outdoor, LLC v. Trussville*, 458 F.3d 1261, 1272 (11th
Cir. 2006) ("[E]ven a temporary infringement of First Amendment
rights constitutes a serious and substantial injury, and the city has
no    legitimate    interest    in    enforcing    an    unconstitutional

---

H.B. 1205, rather than the *Anderson-Burdick* framework.  However, the State
makes no such argument in its Stay Motion.  In other words, the Majority
makes a doctrinal choice between potential legal tests based on no briefing and
fails to distinguish cases that suggest the opposite conclusion.  *See, e.g.*, *Polelle*,
131 F.4th at 1230 (holding *Anderson-Burdick* to be the appropriate framework
to assess a compelled speech claim relating to Florida's closed primary system,
which excludes certain Florida voters from participating in party primaries).
In our extremely preliminary posture, we have no occasion to make such pro-
nouncements about issues not even briefed to us.  *See Sineneng-Smith*, 590 U.S.
at 375; *see also id.* at 376 (explaining that generally courts "decide only ques-
tions presented by the parties" (citation omitted)).

ordinance."); *Florida v. HHS*, 19 F.4th 1271, 1291–93 (11th Cir. 2021) (similar); *Joelner v. Village of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) ("[T]here can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties." (collecting cases) (quotations omitted)).

The State does not present any substantive argument about what it wants to do that it cannot do with the preliminary injunction in place. It provides no details of planned enforcement or fraud which it is investigating and cannot prevent, or really anything at all that requires the urgent, emergency relief of a stay. *See Siegel v. LePore*, 234 F.3d 1163, 1176–77 (11th Cir. 2000) (*en banc*) ("[A]sserted irreparable injury 'must be neither remote nor speculative, but actual and imminent.'" (quoting *City of Jacksonville*, 896 F.2d at 1285)). This similarly justifies denying the motion. *See id.* at 1176 ("[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."). Here, the State's asserted injuries are remote and speculative, and it cannot identify any concrete and pressing limitation the preliminary injunction imposes.[5]

---

[5] The district court's careful construction of the preliminary relief in light of *Trump v. CASA, Inc.*, 145 S. Ct. 2540 (2025), further undermines the State's weak claim of irreparable injury. In *CASA*, the Supreme Court explained that "universal injunctions," which "prohibit the enforcement of a law or policy against *anyone* . . . likely exceed the equitable authority that Congress has granted to federal courts." *Id.* at 2548. Given that holding, the district court here carefully and narrowly tailored its preliminary injunction. *Florida Decides*,

The State does not wrestle with the district court's conclusion that its association of non-residents and non-citizens with fraud in the process is largely unfounded and unaddressed by H.B. 1205's restrictions as a matter of fact. *Florida Decides*, 2025 WL 1884799, at *10. There is nothing in the record or the Stay Motion that suggests the district court's factual findings were implausible or contradicted by more reliable evidence. *Wagner*, 115 F.4th at 1303. Moreover, and importantly, the district court highlighted (or perhaps reminded the State) that "Florida's law enforcement agencies maintain an arsenal of criminal provisions that remain enforceable against bad actors and fraudsters," so the preliminary relief would not deter the State's goals. *Florida Decides*, 2025 WL 1884799, at *12. Any attempt to disturb the district court's conclusion on this point, given this record, violates our standard of review and deviates from the tight, disciplined role we must play in our appellate review.

While the State argues that the "Plaintiffs won't be harmed by a stay"—it does not explain why. Stay Motion at 19. It does not disclaim criminal prosecution of these plaintiffs, nor does it address

---

2025 WL 1884799, at *13. The State is only foreclosed from enforcing these prohibitions as to the specific plaintiffs who showed that they had standing and that H.B. 1205 likely violated their constitutional rights. *Id.* Thus, the only imposition on the State is its inability to enforce these provisions against this small class of plaintiffs during the pendency of this case. Again, the State has not explained that it plans or seeks to engage in enforcement actions against these plaintiffs, so its irreparable injury is remote and speculative. *Siegel*, 234 F.3d at 1176.

25-12370                ABUDU, J., dissenting                21

the general principle that unconstitutional restrictions on speech "harm[] not only [the Plaintiffs] themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Its failure to address these counterarguments underscores its failure to bear its burden.

Finally, issues such as whether lower income families should have access to affordable healthcare to raise healthy kids and whether the State should more actively combat the presence of deadly pollutants in our drinking water are matters of public concern that Plaintiff-Appellees "have a right to discuss publicly without risking criminal sanctions." *Meyer*, 486 U.S. at 421; *see also Thornhill v. Alabama*, 310 U.S. 88, 101–02 (1940) ("The freedom of speech . . . embraces at the least the liberty to discuss publicly and truthfully all matters of public concern without previous restraint or fear of subsequent punishment."). Staying the district court's decision does not serve the public's interest in protecting the "marketplace of ideas," or in ensuring a robust discussion of politically-charged topics. However, it does help cement laws and public policies that impact so many, but only help very few.

For these reasons, the district court's decision should be affirmed, the State's motion for a stay should be denied, and this case should proceed in the normal course where the State must do more than just say "we've been harmed" to get extraordinary relief.

I respectfully dissent.